UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| BRENDA VELASQUEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 7:20-cv-00097-O |
| | § | |
| MARGARET ROGERS et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Margaret Rogers and Mary Elizabeth Romm's Motion for

Summary Judgment (ECF Nos. 54–55), filed April 8, 2021; Defendant Valerie Thomerson's

Motion for Summary Judgment (ECF Nos. 59–60), filed April 9, 2021; Plaintiff Brenda

Velasquez's Consolidated Response (ECF No. 66), filed April 27, 2021; Defendant Lakisha Nicole

McKnight's Second Motion to Dismiss for Lack of Jurisdiction (ECF Nos. 57–58), filed April 9,

2021; Plaintiff's Response (ECF No. 65), filed April 26, 2021; and Defendant McKnight's Reply

(ECF No. 70), filed May 3, 2021.

Having considered the motions, briefing, and applicable law, the Court **GRANTS in part**

and **DENIES in part** Defendants Margaret Rogers and Mary Elizabeth Romm's Motion for

Summary Judgment (ECF Nos. 54–55), **GRANTS in part** and **DENIES in part** Defendant

Valerie Thomerson's Motion for Summary Judgment (ECF Nos. 59–60); and **DENIES** Defendant

Lakisha Nicole McKnight's Second Motion to Dismiss for Lack of Jurisdiction (ECF Nos. 57–

58).

## I.    BACKGROUND

This civil-rights action arises from a probation officer's coerced private adoption of her

probationer's child and retaliatory violation report resulting in the probationer's incarceration

1

during the period to challenge the adoption. In December 2017, Plaintiff Brenda Velasquez ("Velasquez") was placed on probation under the supervision of the Wichita County Community Supervision and Corrections Department ("WCCSCD"). *See* Pl.'s App., Ex. 1, 1–4, ECF No. 66-1; Defs.' App. 6, ECF No. 55-1. At the time, Defendants Margaret Rogers ("Rogers") and Elizabeth Romm ("Romm") served as director and deputy director of the WCCSCD, respectively, overseeing a staff of supervisors who, in turn, directly supervise probation officers. *See* Pl.'s App., Ex. 2, 5–6, ECF No. 66-2; Ex. 3, 5–7, ECF No. 66-3. In January 2018, Rogers and Romm hired Defendant Lakisha Nicole McKnight ("McKnight") as a probation officer and assigned her to Velasquez's caseload. *See* Defs.' App. 7, 16, ECF No. 55-1; Pl.'s App., Rogers Deposition 8:4–9:21, ECF No. 66-2. On September 18, 2018, Defendant Valerie Thomerson ("Thomerson") was promoted from probation officer to supervisor, becoming the direct supervisor of five probation officers including non-party Stephen Gontz ("Gontz") and McKnight. *See* Pl.'s App., Ex. 4, 28, ECF No. 66-4. Rogers, Romm, and Thomerson (sometimes collectively, "supervisor Defendants") had weekly staff meetings from that point forward. Pl.'s App., Ex. 4, 59, ECF No. 66-4. Thomerson had weekly meetings with her supervisees, including with McKnight. Pl.'s App., Ex. 4, 59, ECF No. 66-4.

Before an April 2018 probation office visit, Velasquez was arrested for family violence and learned she was pregnant; she told McKnight of both during her visit. *See* Defs.' App. 7, ECF No. 55-1. McKnight promised Velasquez that she would refrain from filing a violation report for Velasquez's recent arrest while she decided what to do with the child. *See* Defs.' App. 7, ECF No. 55-1. During Velasquez's May 2018 visit, she confided in McKnight that she had a family member interested in adopting the child, and McKnight inquired about adopting the baby herself through a private adoption. Defs.' App. 7, ECF No. 55-1. Velasquez also identified Joseph Rene Bice

("Bice") as the father of the child. Defs.' App. 7, ECF No. 55-1. During their June meeting, McKnight leaned into the adoption—promising to figure out all the details, drive Velasquez to an upcoming appointment, and not violate her in the meantime. Defs.' App. 7, ECF No. 55-1. The next month, McKnight proposed a private adoption and plans to fund the adoption without creating an issue. Pl.'s App., Ex. 12, ECF No. 66-12 ("McKnight would state it has to be a private adoption, because nobody could find out due to the fact that [Velasquez] was on probation."). Over the next few months through a pattern of bullying and bribery, McKnight coerced Velasquez into the adoption. *See, e.g.*, Pl.'s App., Ex. 12, ECF No. 66-12 (McKnight gave Velasquez's $100 for probation fees and later a down payment for an apartment); Pl.'s App., Ex. 6, at 17, ECF No. 66-6 (McKnight also gifted Velasquez furniture for the apartment); Pl.'s App., Ex. 6, at 16, ECF No. 66-6 (McKnight paid Velasquez's cell phone bill); *see also* Def.'s App. 6, 8–9, ECF No. 55-1.

While under McKnight's supervision, Velasquez missed drug tests and probation payments; failed to complete the probation-mandated orientation, training, and community service hours; and was arrested for Assault-Family Violence. Pl.'s App., Ex. 7, ECF No. 66-7; Pl.'s App., Ex. 5, at 8, 35, ECF No. 66-5. Together, Velasquez's actions should have triggered McKnight to file a violation report under WCCSCD policy. Pl.'s App., Ex. 4, ECF No. 66-4; *see also* Pl.'s App., Ex. 4, ECF Nos. 66-4; Pl.'s App., Ex. 3, at 62–63, ECF No. 66-3. According to McKnight, she protected Velasquez by not sending a violation report. Pl.'s App., Ex. 8, at 8, ECF Nos. 66-8; *see also* Pl.'s App., Ex. 12, ECF No. 66-12 (Similarly, McKnight told Velasquez that she had input false community service hours into her file); *see also* Pl.'s App., Ex. 3, at 62–63, ECF No. 66-3.

On October 2, 2018, ten days before Velasquez's due date, McKnight emailed Assistant District Attorney Kyle Lessor ("ADA Lessor") inquiring about Velasquez's case number—"is this one still yours?" Pl.'s App., Ex. 9, ECF No. 66-6. When ADA Lessor responded affirmatively,

Velasquez informed him that she would "probably be working a [violation report] this week[,]" detailing Velasquez's two arrests and failure to pay or attend classes. *Id.* McKnight also cautioned that, while Velasquez was not a drug user herself, she may be a flight risk because "[s]omeone called reporting she is selling meth again and is pla[nn]ing to skip out on probation . . . ." *Id.* McKnight succinctly concluded, "I want revocation with jail time." *Id.* ADA Lessor encouraged McKnight to file the violations and said he would get an arrest warrant to imprison Velasquez without bond as soon as her next reporting date. *Id.*

One week later, Velasquez recorded her intention to give the still-unborn child to McKnight by signing and reading aloud both the Statement to Confer Standing and the Release of Child from Hospital, which were verified by a Texas notary and witnessed by Jeanne Ellis and Tom Cotton (McKnight's attorney). *See* Pl.'s App., Ex. 12, ECF No. 66-12 ("Statement to Confer Standing"); Pl.'s App., Ex. 13, ECF No. 66-13 ("Release of Child from Hospital"). The same day, Velasquez and McKnight signed a catch-up plan for Velasquez's delinquent probation payments and community service hours. Pl.'s App., Ex. 14, ECF No. 66-14 ("Community Service Restitution Plan"); Pl.'s App., Ex. 15, ECF No. 66-15 ("Payment Plan"). Later that same day at 5:20 P.M., Velasquez was admitted to the hospital. Pl.'s App., Ex. 11, ECF No. 66-6. Velasquez gave birth to the child soon thereafter, and McKnight went to the hospital. *Id.*

Three days later, a social worker assessed Velasquez and discussed the adoption with her, noting that she "did not mention the adoption to any of the [nursing] staff" and, when asked, she "commented that it is something that will be taken care of outside of [the] hospital and acted as though she didn't want [the] hospital to know about the adoption." Pl.'s App., Ex. 11, ECF No. 66-6. The social worker told Velasquez that she needed to complete a Third-Party Release form for the baby to discharge with the adoptive couple. *Id.* Understanding, Velasquez explained that

4

"she doesn't know exactly what the plan is, commenting that adoptive parents will be here later [that day]." *Id.* After their meeting, the social worker returned an earlier phone call from McKnight. *Id.* Sooner thereafter, a hospital doctor assessed Velasquez, observing her to be "frustrated" based on her saying "I just want to go home" and "I am not leaving my baby." *Id.* That night, the hospital discharged Velasquez; the baby was to be discharged the next day with McKnight. *Id.*

The next day around noon, Velasquez signed and read aloud Mother's Affidavit for Voluntary Relinquishment of Parental Rights, designating McKnight and her husband as managing conservators of the child and waiving her rights to testify in court about the child at later termination and adoption proceedings. Pl.'s App., Ex. 18, ECF No. 66-6 ("Mother's Affidavit for Voluntary Relinquishment of Parental Rights"). The document is witnessed by Tom Cotton (McKnight's attorney) and Megan Clubb. *Id.* According to Velasquez, she acquiesced to signing the adoption paperwork because she "felt threatened out of fear [McKnight] would have [her] arrested if [she] did not sign the papers." Pl.'s App., Ex. 6, at 25, ECF No. 66-6.

According to handwritten records by Rogers, McKnight requested maternity leave from Rogers before the child was born. Pl.'s App., Exs. 16–17, ECF No. 66-6 ("McKnight's Employment Records"); *see also* Pl.'s App., Ex. 12, ECF No. 66-12; Pl.'s App., Ex. 25, ECF No. 66-25. Rogers granted McKnight's request for the period of October 16 to December 10, 2018, noting the child was expected to be born on Friday, October 12, 2018. Pl.'s App., Ex. 16, ECF No. 66-6. While on leave on October 29, 2021, McKnight emailed Rogers, informing her that she had learned that—only coincidentally—she was in possession of Velasquez's child, attaching the signed Statement to Confer Standing and a United Regional Certificate of Birth, both of which show Velasquez as the birth mother of the child. Pl.'s App., Ex. 23, ECF No. 66-23. In the email,

McKnight explained that she "was aware that [Velasquez] was pregnant" but that "she was always reluctant to provide information about any aspects of her life." Pl.'s App., Ex. 23, ECF No. 66-23. McKnight also informed Rogers that "[p]rior to [her] leave, [McKnight] was working on a [violation report] due to non compliance [sic] and 2 arrests for [Velasquez]." Pl.'s App., Ex. 23, ECF No. 66-23. Recognizing the "huge conflict," McKnight requested that she be removed from the caseload, that she be denied access to Velasquez files, and that "the new officer complete her violation report" because McKnight "d[id]n't want anyone to assume [she] used a personal reason[] to manage [Velasquez's] case and violate her." Pl.'s App., Ex. 23, ECF No. 66-23. Although McKnight mentioned "[t]his is a private family matter," she still needed to tell Rogers to "avoid any liabilities with the department." Pl.'s App., Ex. 23, ECF No. 66-23. Rogers curtly responded, "The case will be transferred to another CSO today."  Pl.'s App., Ex. 23, ECF No. 66-23.

Rogers also instructed Thomerson to transfer Velasquez's caseload from McKnight to Gontz and to write in a transfer summary "This case is being transferred to CSO Gontz for continued direct supervision." Pl.'s App., Ex. 23, ECF No. 66-6. Thomerson followed the directive. Pl.'s App., Ex. 23, ECF No. 66-6. Thomerson testified that then she knew that Velasquez had violated the WCCSCD's Code of Ethics and personnel manual and Community Justice Assistance Division's standards. Pl.'s App., Ex. 4, at 42–44, ECF No. 66-4; *see also* Pl.'s App., Ex. 45, ECF No. 66-45; Pl.'s App., Ex. 48, ECF No. 66-48. Rogers, Romm, and Thomerson never performed any further investigation or spoke to Velasquez or McKnight because, according to Rogers, "it wasn't necessary." Pl.'s App., Ex. 2, at 48, ECF No. 66-2. When Gontz inherited McKnight's caseload, he learned that McKnight had started a violation report and Gontz finished

it with a recommendation that Velasquez's probation be modified and that she take a class. Pl.'s App., Ex. 29, ECF No. 66-7.

Two days later, Gontz and Thomerson signed the violation report and sent it to ADA Lessor, recommending Velasquez take a class. Pl.'s App., Ex. 7, ECF No. 66-7.[1] According to Gontz, he remembered Thomerson telling him that they could not send in the violation report with McKnight's name on it since she had adopted Velasquez's baby and instructing him to instead sign it. Pl.'s App., Ex. 31, at 30, ECF No. 66-31. That same day, the 89th Judicial District Court of Wichita Falls ("89th District Court") entered an order terminating Velasquez's parental rights and granting managing conservatorship of her child to McKnight, without Velasquez present. Pl.'s App., Ex. 37, ECF No. 8. One month later, on December 5, 2018, the 89th District Court granted McKnight's adoption of Velasquez's child, again without Velasquez present; that same day, Velasquez was arrested and remained incarcerated until her motion to revoke hearing six months later. Pl.'s App., Ex. 33, ECF No. 66-33; Pl.'s App., Ex. 32, at 1–10, ECF No. 66-32. The 89th District Court's termination and adoption orders remain standing.

When McKnight learned of the violation report on December 14, 2018, she personally emailed ADA Lessor and told him that the recommendation was wrong and that there would be a supplemental report that recommended revocation and prison time. Pl.'s App., Ex. 10, ECF No. 66-10. McKnight emailed ADA Lessor, copying Thomerson, to inform him that "[w]hen the other officer [Gontz] completed the PSI Supplement[,] he put the incorrect recommendation." Pl.'s App. 10, ECF No. 66-6. Instead, McKnight would "submit another PSI Supplement with the original recommendation of Violation of Probation/TDJCJ jail time." *Id.* The violation report led to a revocation hearing on May 17, 2019, during which McKnight and Thomerson committed

---

[1] A September 2018 failure to report was cited in Velasquez's motion to revoke. Pl.'s App., Ex. 7, at 1–2, ECF No. 66-7; *see* Pl.'s App., Ex. 5, at 1–25, ECF No. 66-5

aggravated perjury and the hearing was interrupted to review Velasquez's file for any civil rights violations. Pl.'s App., Ex. 32, at 79, 82, ECF No. 66-32.

In June 2020, Velasquez sued Defendants in the 78th District Court of Wichita County, alleging violations of her constitutional right to a parent-child relationship under 42 U.S.C. § 1983. Not. of Removal, ECF No. 1. Defendants Romm and Rogers removed to this Court. *Id.* All Defendants separately moved to dismiss the claim under Rule 12(b)(1) based on the *Rooker-Feldman* doctrine, which the Court denied. ECF No. 40. Defendants Rogers and Romm and Defendant Thomerson now move for summary judgment. ECF No. 54, 59. Defendant McKnight moves to dismiss Velasquez's claim again under Rule 12(b)(1). ECF No. 57. The motions are ripe for the Court's consideration.

## II.   LEGAL STANDARD

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not "a disfavored procedural shortcut," but rather an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See Celotex*, 477 U.S. at 323. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner

in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

## III.    ANALYSIS

### A. *Rooker-Feldman* Doctrine

At the outset, each Defendant revives the *Rooker-Feldman* doctrine as grounds to dismiss this case for lack of jurisdiction. *See* Romm. Mot. 4–7, ECF No. 55; McKnight Mot. 3–6, ECF No. 58; Thomerson Mot. 8–11, ECF No. 60. The Court recognizes that "'the subject matter jurisdiction of a federal court can be challenged at any stage of the litigation . . . .'" *Soaring Wind Energy, L.L.C. v. Catic USA Inc.*, 946 F.3d 742, 750 (5th Cir. 2020) (quoting *Randall & Blake, Inc. v. Evans* (*In re Canion*), 196 F.3d 579, 585 (5th Cir. 1999)). However, Plaintiff's claims remain unchanged since the Court's order rejecting the same *Rooker-Feldman* argument. *See* Order 6–9, ECF No. 40. For the same reasons set forth in the Court's prior order, *see id.*, the Court rejects Defendants' *Rooker-Feldman* arguments and concludes it has subject matter jurisdiction here. Accordingly, on this basis, the Court will deny McKnight's motion in its entirety and deny in part Thomerson's motion and Rogers and Romm's motion.

### B. Qualified Immunity

As their alternative basis for summary judgment, the supervisor Defendants assert their entitlements to qualified immunity. *See* Romm. Mot 7–14, ECF No. 54; Thomerson Mot. 11–17, ECF No. 59.[2] In response, Velasquez contends that this is the "obvious case" in which "Defendants are not entitled to qualified immunity" because the supervisory Defendants "all violated [Velasquez]'s [Fourteenth] Amendment Substantive Due Process right." Resp. 23–24, ECF No. 66 (citing *Brousseau v. Haven*, 543 U.S. 194, 199 (2004); *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).

The doctrine of qualified immunity protects government officials sued under section 1983 "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is important to resolve qualified immunity questions at the earliest possible stage in the litigation. *Id.* The burden of proof for overcoming a qualified immunity defense at the summary judgment stage rests upon plaintiffs. *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 490 (5th Cir. 2001). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)).

The relevant question is whether a reasonable official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. *Reese*, 926

---

[2] Because Thomerson's qualified immunity arguments largely overlap with Rogers and Romm's, the Court cites interchangeably Rogers and Romm's motion as representative of Thomerson's for the purposes of this order.

10

F.2d at 499. If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Conversely, if it was apparent when the conduct was undertaken that the conduct would be a violation of the right at issue, the officer's conduct is not protected by qualified immunity. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Jones v. City of Jackson*, 203 F.3d 875, 879 (5th Cir. 2000).

At this stage, Velasquez bears the burden of establishing that the facts show (1) the supervisor Defendants violated one of Velasquez's constitutional rights and (2) the right was "clearly established"[3] at the time of the supervisor Defendants' alleged misconduct. *Ontiveros*, 564 F.3d at 382; *accord Saucier v. Katz*, 533 U.S. 194, 194 (2001); *Pearson*, 555 U.S. at 236. For the forthcoming reasons, the Court concludes that Velasquez has failed to carry her burden as to the first prong, so the supervisor Defendants are entitled to qualified immunity.

Plaintiff alleges violation of her constitutional right to the parent-child relationship under the Fourteenth Amendment and seeks to hold Rogers, Romm, and Thomerson liable as supervisors of McKnight. *See* Resp. 23, ECF No. 66. "Supervisory officials cannot be held liable under section 1983 for the actions of subordinates . . . on any theory of vicarious or *respondeat superior* liability." *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Instead, a plaintiff "must show that *the conduct of the supervisors* denied [plaintiff her] constitutional rights. *Id.* (emphasis added)

---

[3] In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts . . . to not define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of *particular* conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

(citing *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)). Velasquez contends that the supervisor Defendants violated her constitutional rights by failing to train or supervise McKnight resulting in "her parent-child relationship [being] terminated on October 31, 2018." Resp. 25, ECF No. 66 (citing Tex. R. Civ. P. 320; Tex. Fam. Code § 161.211). Velasquez fails to meet her burden as to any theory of supervisory liability, leaving the relevant elements and factual inquiries entirely unaddressed and largely blurring the distinct "constitutional violation" and "clearly established law" inquiries—rehashing the Supreme Court's parent-child relationship jurisprudence for both. *See* Resp. 24–25, ECF No. 66 (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Mayer v. Nebraska*, 262 U.S. 390 (1923); *Santosky v. Kramer*, 455 U.S. 745 (1982)). Even had Velasquez carried her burden, the Court finds that there is no genuine dispute of material fact as to the elements of supervisory liability and that summary judgment is proper.

When, as here, a plaintiff alleges a failure to train or supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998). "Proof of deliberate indifference normally requires a plaintiff to show a pattern of violations and that the inadequate training or supervision is obvious and obviously likely to result in a constitutional violation." *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010). Even assuming there was evidence of causation, the supervisor Defendants' actions fall well short of "deliberate indifference" based on the relevant summary judgment evidence.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of*

12

*Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (internal quotations and brackets omitted). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Smith*, 158 F.3d at 912 (internal quotation marks and citations omitted). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *N. Richland Hills*, 406 F.3d at 381. "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *See Alton v. Texas A&M University*, 168 F.3d 196, 201 (5th Cir. 1999). "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'" *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001))."[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a supervisor might reasonably be found to be deliberately indifferent. *City of Canton*, 489 U.S. at 390.

Even accepting Velasquez's date of the alleged constitutional violation, "[f]acts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam); *see also Brown*, 623 F.3d at 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight." (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989))). Those facts confronting the officials "must be judged from the perspective of a reasonable officer . . . ." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019), as revised (Aug. 21, 2019), *cert. denied sub nom. Hunter v.*

13

*Cole*, 141 S. Ct. 111 (2020). Thus, the Court considers the facts confronting Rogers, Romm, and Thomerson from their perspectives before the termination of Velasquez's parental rights on October 31, 2021. For each supervisor Defendant, the evidence is plainly insufficient to demonstrate supervisory liability.

### 1. Rogers – Director of WCCSCD

In late 2017, Rogers interviewed and hired McKnight to be a probation officer in the WCCSCD. *See* Defs.' App. 16, ECF No. 55-1; Pl.'s App., Rogers Deposition 8:4–9:21, ECF No. 66-2. Over the next several months, Rogers had weekly meetings with her deputy director Romm and bi-weekly meetings with the supervisors. Rarely did Rogers meet with individual probation officer like McKnight. At some point before the child's birth, McKnight approached Rogers about "tak[ing] off work for something about the adoption process[,]" and Rogers instructed her to get a time-off slip from her supervisor. Pl.'s App., Rogers Deposition 21:4–18, ECF No. 66-2. Sometime before October 12, 2018, Rogers knew McKnight had plans to adopt a child but was unaware of the child belonging to Velasquez. *See* Def.'s App. 16, ECF No. 55-1 Pl.'s App., Rogers Deposition 19:21–25, ECF No. 66-2. Rogers was approached by McKnight about requesting maternity leave from October 12 to December 10, and Rogers granted the request. Pl.'s App., Exs. 16–17, ECF No. 66-6 ("McKnight's Employment Records"); *see also* Pl.'s App., Ex. 12, ECF No. 66-12; Pl.'s App., Ex. 25, ECF No. 66-25; Pl.'s App., Rogers Deposition 20:1–21:3, ECF No. 66-2.

On October 29, 2018, Rogers learned for the first time that McKnight was in possession of Velasquez's baby. *See* Pl.'s App., Rogers Deposition 22:16–24, ECF No. 66-2. That day, she received an email from McKnight. According to the email, McKnight learned that she was coincidentally in possession of her probationer's child and identified Velasquez as the mother.

14

Noting the "huge conflict" and seeking to "avoid any liabilities within the department," McKnight explained that the confusion and conflict arose because she "was under the impression the birth mother was in the DFW area[,] and [Velasquez] never requested a travel permit . . . ." McKnight also told Rogers that she "was aware that [Velasquez] was pregnant" but that Velasquez had been "reluctant to provide information about any aspects of her life." Pl.'s App., Ex. 23, ECF No. 66-23.

      In the same email, McKnight told Rogers that "[p]rior to [her] leave, [McKnight] was working on a [violation report] due to non compliance [sic] and 2 arrests for [Velasquez]." Pl.'s App., Ex. 23, ECF No. 66-23. McKnight requested that she be removed from the caseload, that she be denied access to Velasquez's files, and that "the new officer complete her violation report" because McKnight "d[id]n't want anyone to assume [she] used a personal reason[] to manage [Velasquez's] case and violate her." Pl.'s App., Ex. 23, ECF No. 66-23. She attached to the email the signed Statement to Confer Standing and a United Regional Certificate of Birth, both of which show Velasquez as the birth mother of the child. Pl.'s App., Ex. 23, ECF No. 66-23.

      Rogers responded to McKnight, "The case will be transferred to another CSO today." Pl.'s App., Ex. 23, ECF No. 66-23. Rogers also instructed Thomerson to transfer Velasquez's caseload from McKnight to Gontz and to write in a transfer summary "This case is being transferred to CSO Gontz for continued direct supervision." Pl.'s App., Ex. 23, ECF No. 66-6. Rogers never performed any further investigation or spoke to Velasquez or McKnight because, according to Rogers, "it wasn't necessary." Pl.'s App., Ex. 2, at 48, ECF No. 66-2. Rogers also never notified the District Attorney's Office of a conflict of interest. *See* Def.'s App. 16, ECF No. 55-1; Pl.'s App., Rogers Deposition 25:4–14, ECF No. 66-2.

### 2. *Romm – Deputy Director of WCCSCD*

Before the birth of the child, Romm learned that McKnight was planning to adopt a child during a meeting with Rogers. *See* Pl.'s App., Romm Deposition 31:18–23, ECF No. 66-3. On October 12, 2021, Romm received word that McKnight was going to the hospital to pick up the child. *See* Pl.'s App., Romm Deposition 30:24–31:10, ECF No. 66-3. Rogers informed Romm sometime after receiving the October 29, 2018, email that McKnight was in possession of Velasquez's baby. *See* Pl.'s App., Rogers Deposition 24:4–23, ECF No. 66-2; *See* Pl.'s App., Romm Deposition 32:21–33:5, ECF No. 66-3. Romm never followed up with McKnight or Velasquez about the situation. *See* Pl.'s App., Romm Deposition 33:12–14, ECF No. 66-3.

### 3. *Thomerson – Direct Supervisor of McKnight*

In September 2018, Thomerson was promoted to a supervisor within the WCCSCD, charged with overseeing McKnight among other probation officers. *See* Pl.'s App., Thomerson Deposition 17:3–15, 22:1–9, ECF No. 66-4. Thomerson learned in the "first part of October" that McKnight was seeking an adoption and allowed McKnight to have time off to sign the adoption paperwork. *See* Pl.'s App., Thomerson Deposition 22:16–25, ECF No. 66-4; Pl.'s App., Thomerson Deposition 23:11–16, ECF No. 66-4. In mid-October, McKnight requested some additional time off from Thomerson, who recalled a face-to-face conversation with McKnight. *See* Pl.'s App., Thomerson Deposition 25:16–27:10, ECF No. 66-4. During that conversation, McKnight explained that, upon signing paperwork, she realized Velasquez was the birth mother of the child; Thomerson referred her to Rogers. *Id.* Thomerson did not contact Rogers herself but did talk to Romm. *Id.*; *see also id.* at 28:19–22. On October 29, 2018, Rogers instructed Thomerson to transfer Velasquez to Gontz's caseload. Pl.'s App., Thomerson Deposition 28:12–14, ECF No. 66-4; *see also* Pl.'s App., Ex. 23, ECF No. 66-6.

16

Having thoroughly reviewed the record and relevant facts leading up to the alleged constitutional violation, the Court finds that, while the supervisor Defendants actions could have been arguably contrary to the WCCSCD's internal policies, negligent, or misguided, they do not rise to the level of "deliberate indifference" required to divest an official of qualified immunity under a theory of supervisory liability. *See Alton*, 168 F.3d at 201. Velasquez alleges her rights were terminated on October 31, 2018. She has failed to show both "a pattern of violations" and, even if so, how that pattern demonstrated a need "so obvious" to likely result in the violation of her parent-child right based on the facts from the perspective of the supervisor Defendants at the time of the alleged constitutional violation, given the timing of the notice of this event to Defendants. *See Cousin*, 325 F.3d at 637; *City of Canton*, 489 U.S. at 390. Velasquez's qualified immunity arguments presuppose, with the benefit of hindsight, that Rogers, Romm, and Thomerson (like every reasonable officer) should not have taken McKnight at her word that the adoption was merely a "coincidence" upon McKnight's self-initiated disclosure and recusal. *See* Resp. 23–26, ECF No. 66 ("It is clear that by October 29, 2019, there should have been a concern in Rogers mind that this might be a case of Official Oppression which is a violation of the Texas Penal Code . . . [and] an actual conflict of interest which is prohibited by the Ethics Code.").

While any citizen might wish government employees to have the sort of foresight Velasquez demands, based on the facts presented to the supervisor Defendants at the time the alleged constitutional deprivation occurred, none of the supervisor Defendants acted with deliberate indifference. Indeed, it appears the undisputed facts are that Rogers and Room had no notice of McKnight's actions until October 29, 2018, and upon learning the facts immediately transferred supervision away from her. The facts show Thomerson learned of the McKnight's adoption and the conflict in "mid-October" at the earliest, and she immediately referred McKnight

17

to Rogers who in turn ultimately instructed her to transfer McKnight off of Velasquez's caseload. These facts do not suffice for Velasquez to meet her burden of showing a genuine dispute of material fact as to deliberate indifference for supervisory liability to attach Rogers, Romm, or Thomerson.

Neither the importance of the alleged violated constitutional right, the obviously deceptive and malicious nature of McKnight's abuse of power, nor the facts post-dating the termination of Velasquez's parental rights on October 31, 2018, alter Velasquez's burden at this stage or Rogers's, Romm's, or Thomerson's entitlements to qualified immunity. *See* Resp. 23–26, ECF No. 66. Accordingly, the Court finds that Velasquez has failed to meet her burden of showing the supervisor Defendants are not entitled to qualified immunity[4] and concludes Rogers, Romm, and Thomerson are each entitled to qualified immunity. *See Salas*, 980 F.2d at 306.

## VI.    CONCLUSION

For the foregoing reasons, the Court concludes that it has subject-matter jurisdiction and that Defendants Rogers, Romm, and Thomerson are entitled to qualified immunity. Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendants Margaret Rogers and Mary Elizabeth Romm's Motion for Summary Judgment (ECF Nos. 54–55), **GRANTS in part** and **DENIES in part** Defendant Valerie Thomerson's Motion for Summary Judgment (ECF Nos. 59–60); and **DENIES** Defendant Lakisha Nicole McKnight's Second Motion to Dismiss for Lack of Jurisdiction (ECF Nos. 57–58). Plaintiff's section 1983 claims against Rogers, Romm, and

---

[4] Because the Court finds Velasquez failed to meet her burden of showing any of the supervisor Defendants violated her constitutional rights, the Court need not review whether the alleged constitutional right was clearly established at the time. *See Pearson*, 555 U.S. at 231 (2009).

Thomerson are hereby **DISMISSED with prejudice**.[5] Pursuant to Federal Rule of Civil Procedure

58(a), a partial final judgment shall issue separately.

      **SO ORDERED** on this **26th day** of **May, 2021**.

                Reed O'Connor

                **UNITED STATES DISTRICT JUDGE**

---

[5] In finding dismissal appropriate for the section 1983 claims based on a constitutional violation of the substantive due process "parent-child right," the Court disclaims any prejudicial effect this order might be perceived to have on other section 1983 claims or underlying constitutional violations such as state actors depriving Velasquez of her liberty by submitting false or perjurious testimony in order to gain an advantage in the adoption, or failing to supervise others to make sure any violation does not happen.